IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

MANUEL A. BENAVIDEZ,           §
                               §
            Plaintiff,         §
                               § Civil Action No. 3:08-CV-0924-D
VS.                            §
                               §
IRVING INDEPENDENT SCHOOL      §
DISTRICT, TEXAS, et al.,       §
                               §
            Defendants.        §

MEMORANDUM OPINION

Plaintiff Manuel A. Benavidez ("Benavidez"), a Hispanic
resident of the Irving Independent School District ("Irving ISD"),
brings this action under § 2 of the Voting Rights Act of 1965, 42
U.S.C. § 1973, challenging the Irving ISD at-large system of
electing members of the Board of Trustees. Following a bench
trial, and for the reasons that follow,[1] the court finds that
Benavidez has failed to prove the first essential element of a § 2
claim. To satisfy this requirement, Benavidez must prove that the
Hispanic minority group in the school district is sufficiently
large and geographically compact to constitute a majority in a
single member district. *See Thornburg v. Gingles*, 478 U.S. 30, 50
(1986). To meet this burden of proof, Benavidez relies on the 2007
one-year American Community Survey data ("2007 ACS data") rather
than data from the 2000 Census. Benavidez has failed to prove that
his alternate population figures are thoroughly documented, have a

---

[1]The court sets out in this memorandum opinion its findings of
fact and conclusions of law. *See* Fed. R. Civ. P. 52(a)(1).

high degree of accuracy, and are clear, cogent, and convincing.  He has therefore failed to overcome the strong presumption that the 2000 Census data are correct.  Because he cannot meet the first *Gingles* element based on 2000 Census data, the court finds in favor of defendants.

I

The Irving ISD is substantially located within the city of Irving, Texas, although the boundaries of the two entities are not coterminous.  The school district is governed by a Board composed of seven trustees (the "Board") who are elected in district-wide elections.  Trustee candidates run at large for specific numbered positions, with approximately one-third of the positions up for election each year.  The only pertinent requirement for election is that the candidate reside within the boundaries of the Irving ISD. Any eligible voter residing within the district can vote for all trustee positions that are up for election in a given year.

The 2000 Census showed that Hispanics made up 35.63% of the district's total population.  Of the adult Hispanics[2] residing in the district, almost 60% were not citizens.[3]  Therefore, Hispanics made up only 17.13% of the district's eligible voters.  In other words, only 17.13% of the district's citizen voting age population

_____

[2]Throughout this memorandum opinion, the term "adult" means a person age 18 or older and therefore eligible by age to vote.

[3]For purposes of this decision, it is irrelevant whether a non-citizen was present in the district legally or illegally.

- 2 -

("CVAP") in 2000 was Hispanic.

The 2000 Census consisted of a "short form," which was intended to survey every household in the United States, and a "long form," which was sent to approximately 18 million households. The short form collected basic information, such as age, sex, race, and Hispanic origin, while the long form asked more detailed questions on topics such as citizenship and socioeconomic status. The U.S. Census Bureau ("Census Bureau") has announced that it will not use the long form questionnaire for the 2010 Census. Instead, it will rely on annual ACS data to estimate the United States population's characteristics in more detail than has been provided by the basic data derived from short form census responses.

The ACS is an annual nationwide survey, conducted throughout the year by the Census Bureau, that covers many of the same topics as the old long form. The ACS samples three million households each year, a significantly smaller annual sample than the eighteen million covered by the census long form every ten years. The first ACS sample was conducted in 2005, and the first full set of data was released in 2006.

Benavidez's experts rely on 2007 ACS data to estimate the proportion of the Irving ISD population that is Hispanic.[4] According to the data, in 2007 Hispanics made up 45.48% of the

---

[4]The 2007 ACS data were the most recent released at the time the testifying experts compiled their reports.

total population and 23.08% of the CVAP (i.e., eligible voters). The data suggest that Hispanics have grown significantly as a share of the overall school district population since 2000. The student population was 68% Hispanic in 2008. But the percentage of Hispanics who are non-citizens has not changed significantly. According to Benavidez, the percentage remained at approximately 60% in 2007. *See* P. Ex. 1 at Table 3.

Only one Hispanic has ever been elected to the Board. Ruben Franco ("Franco") was elected in 2000, defeating another Hispanic candidate,[5] and he was reelected without opposition in 2003. There have been four other elections in which a Hispanic candidate has run for trustee, but despite receiving a majority of the Hispanic vote, the candidate lost the election to a non-Hispanic candidate.[6]

Benavidez sues the Irving ISD and the Board trustees in their official capacities. He alleges that the district's at-large system of electing trustees denies Hispanic voters the opportunity to participate meaningfully in the electoral process and to elect representatives of their choice, in violation of § 2 of the Voting Rights Act.

_____

[5]No non-Hispanic candidate opposed Franco in the 2000 election.

[6]Two Hispanic candidates ran unsuccessfully for different trustee places in 2006, and two other Hispanic candidates ran unsuccessfully for places in 2008.

- 4 -

II

In 1982 Congress substantially revised § 2 of the Voting Rights Act to clarify that a violation requires evidence of discriminatory effects alone, and to "'make clear that proof of discriminatory intent is not required to establish a violation of Section 2.'" *League of United Latin Am. Citizens # 4434 (LULAC) v. Clements*, 986 F.2d 728, 741 (5th Cir. 1993) (quoting S. Rep. No. 417, 97th Cong., 2d Sess. at 2 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 178 ("*Senate Report*")). Section 2(b) now provides that the Act is violated if,

> based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by [a class of persons of a certain race or color] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973(b).

In *Gingles* the Supreme Court first considered the 1982 amended version of § 2, setting out the current framework for analyzing § 2 cases. To prevail on a § 2 claim, a plaintiff must first prove that (1) the minority group is "sufficiently large and

- 5 -

geographically compact to constitute a majority in a single member district," (2) the minority group "is politically cohesive," and (3) "the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 50-51 (internal citations omitted). "Failure to establish any one of the *Gingles* factors precludes a finding of vote dilution, because '[t]hese circumstances are necessary preconditions for multimember districts to operate to impair minority voters' ability to elect representatives of their choice.'" *LULAC v. Clements*, 986 F.2d at 743 (quoting *Gingles*, 478 U.S. at 50) (alteration in original). "[The Fifth Circuit] has interpreted the *Gingles* factors as a bright line test." *Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848, 852 (5th Cir. 1999). "Each factor must be proved[.]" *Id.* "'[F]ailure to establish any one of these threshold requirements is fatal.'" *Id.* (quoting *Campos v. City of Houston*, 113 F.3d 544, 547 (5th Cir. 1997)).[7]

_____

[7]If a plaintiff meets the threshold *Gingles* test, the court must then engage in a broader "totality of the circumstances" inquiry, considering whether the minority group has demonstrated that "under the totality of the circumstances, 'its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.'" *LULAC v. Clements*, 986 F.2d at 747 (quoting 42 U.S.C. § 1973(b)). This requires a "searching practical evaluation of the 'past and present reality.'" *Gingles*, 478 U.S. at 45 (quoting *Senate Report* at 30). In conducting this broader inquiry, the court may consider objective factors derived from the *Senate*

> Multimember districts and at-large election
> schemes . . . are not *per se* violative of
> minority voters' rights.  Minority voters who
> contend that the multimember form of
> districting violates § 2, must prove that the
> use of a multimember electoral structure
> operates to minimize or cancel out their
> ability to elect their preferred candidates.

*Gingles*, 478 U.S. at 48 (citations omitted).  A plaintiff must prove a § 2 violation by a preponderance of the evidence.  *League of United Latin Am. Citizens #4552 (LULAC) v. Roscoe Indep. Sch. Dist.*, 123 F.3d 843, 846 (5th Cir. 1997).

III

Under the first prong of *Gingles*, Benavidez must prove that the Hispanic population in the Irving ISD is "sufficiently large and geographically compact to constitute a majority in a single member district."  *LULAC v. Clements*, 986 F.2d at 742.  To meet this requirement, Benavidez must establish that there is a potential single member district (the "demonstration district") in which a majority of the CVAP is Hispanic.  *See id.* at 743; *Reyes v. City of Farmers Branch, Tex.*, 586 F.3d 1019, 1023 (5th Cir. 2009) (holding that only *citizen* voting age population is relevant in evaluating first prong of *Gingles*).  The Supreme Court recently considered the "minimum-size question," *Bartlett v. Strickland*, ___ U.S. ___, 129 S.Ct. 1231, 1242 (2009) (plurality opinion), concluding that the majority-minority rule "relies on an objective,

---

*Report* that accompanied the 1982 amendments, although these factors are neither "comprehensive nor exclusive."  *Id.*

numerical test: Do minorities make up more than 50 percent of the voting age population in the relevant geographic area?"  *Id.* at 1245.  "That rule provides straightforward guidance to courts and to those officials charged with drawing district lines to comply with § 2."  *Id.*  This requirement is essential to demonstrate that "minority voters possess the *potential* to elect representatives." *Gingles*, 478 U.S. at 50 n.17 (emphasis in original).[8]

Benavidez relies on the expert testimony of David Ely ("Ely") to satisfy this element of *Gingles*.[9]  Ely used data from the 2000 Census and the 2007 ACS data[10] to draw three demonstration districts——District A, District B, and District C——which he labeled illustrative districts.   He drew District A with the aim of maximizing Hispanic CVAP within the district.   He drew District B

---

[8]Benavidez must also prove that his demonstration district satisfies the Equal Protection Clause of the Fourteenth Amendment by complying with the one-person, one-vote requirement articulated in *Reynolds v. Sims*, 377 U.S. 533 (1964), and that the Hispanic population in the demonstration district is geographically compact. *See League of United Latin Am. Citizens (LULAC) v. Perry*, 548 U.S. 399, 433 (2006).  The court will assume *arguendo* that Benavidez has satisfied each requirement.

[9]As is commonly the case in § 2 litigation, Benavidez's claim turns on the expert witnesses' factual testimony.   *LULAC v. Clements*, 986 F.2d at 736 ("As with all cases under the Voting Rights Act, this one is driven by the facts.").

[10]Ely also reviewed 2006 and 2008 Dallas County election returns and Dallas County's 2008 lists of actual and registered voters.

to modify District A to include Benavidez's residence.[11]  And he drew District C to take into account actual Hispanic registration data, with less focus on CVAP.  Ely relied on 2007 ACS data to make projections of the Hispanic CVAP in the illustrative districts as of 2008.  He testified that all of his illustrative districts satisfy the first *Gingles* prong and that any one of the three could be the demonstration district.

By Ely's own admission, none of the illustrative districts on which Benavidez relies has greater than a 50% Hispanic share of CVAP according to 2000 Census data.  The Hispanic CVAP shares range from 41.7% to 45.4%.  As the Supreme Court has made clear, the 50%

─────────────────────

[11]At trial, Ely made clear that he added the extension in District B to include Benavidez's residence in the proposed district for standing purposes.  Defendants question Benavidez's standing.  *See* Tr. 3:128.

Article III standing requires that the plaintiff has suffered an injury in fact, causally connected to the conduct complained of, that is likely to be redressed by a favorable decision from the court.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  In electoral districting cases, the plaintiff must be a resident of the area of minority concentration to have standing to sue.  *See Whitcomb v. Chavis*, 403 U.S. 124, 137 n.17 (1971).  If District B's CVAP is in fact majority Hispanic, and the other *Gingles* requirements have been met, Benavidez has sustained an injury in fact under the current at-large voting system and has demonstrated that his injury is causally connected to this electoral system.  His alleged injury can be redressed by a decision ordering the creation of single member districts.

Although the court is deciding this case against Benavidez on the merits, "standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal." *Warth v. Seldin*, 422 U.S. 490, 500 (1975).  Standing is a threshold question, not a merits inquiry.  *See Farrakhan v. Gregoire*, ___ F.3d ___, 2010 WL 10969, at *8 (9th Cir. Jan. 5, 2010).  The court holds that Benavidez has standing.

threshold is a bright line test.  Therefore, if Benavidez cannot prove the reliability of the 2007 ACS data, and cannot overcome the presumption that the 2000 Census is correct, *see, e.g., Fairley v. Hattiesburg, Mississippi*, 584 F.3d 660, 674 (5th Cir. 2009), he cannot satisfy the first *Gingles* factor.  *See Bartlett*, 129 S.Ct. at 1245.

IV

A

In the Fifth Circuit, "[c]ensus figures are presumed accurate until proven otherwise.  Proof of changed figures must be thoroughly documented, have a high degree of accuracy, and be clear, cogent and convincing to override the presumptive correctness of the prior decennial census." *Valdespino*, 168 F.3d at 853-54 (quoting district court opinion).

ACS data are produced by the Census Bureau and will replace the decennial long form questionnaire, indicating that the Census Bureau finds the data to be reliable for certain purposes.  But the Census Bureau has issued a guide ("ACS Guide") to using the ACS data that clearly states that, for populations under 65,000, "the ACS samples too few households to provide *reliable* single-year estimates.  For these communities, several years of data will be pooled together to create reliable 3-year or 5-year estimates." P. Ex. 16 at 52 (emphasis added).  According to the ACS Guide, as a result of the smaller sample size, "the ACS needs to *combine*

population or housing data *from multiple years* to produce *reliable numbers* for small counties, neighborhoods, and other local areas." P. Ex. 16 at 46 (emphasis added). The Census Bureau will therefore release one-year, three-year, and five-year ACS estimates.

In addition, the ACS Guide cautions that ACS data have greater margins of error than do traditional census data. *See* P. Ex. 16 at 51. The Census Bureau publishes margins of error for every ACS estimate so that statisticians and demographers can use the data appropriately. Larger margins of error do not indicate that the data are unreliable for all purposes, but the margins of error must be taken into account nonetheless, and the purposes for which the data may be used must be limited accordingly.

The Census Bureau also notes that the decennial census and ACS data perform different functions. The ACS Guide states that

> [w]hile the main function of the decennial census is to provide *counts* of people for the purpose of congressional appointment and legislative redistricting, the primary purpose of the ACS is to measure the changing social and economic *characteristics* of the U.S. population. As a result, the ACS does not provide official counts of the population in between censuses.

P. Ex. 16 at 47 (emphasis in original).

B

Ely relies on 2007 ACS data to prove that there has been a statistically significant increase in the Hispanic share of CVAP in the Irving ISD since 2000, indicating that the 2000 Census data are

- 11 -

out of date and that each illustrative district now contains a greater than 50% Hispanic CVAP. Ely estimates that his three illustrative districts now have Hispanic CVAP shares ranging from 51.87% to 55.42%.

Ely did not have access to any three-year or five-year data when he created his report, and thus relied only on the 2007 one-year ACS data. Ely argues that his use of the 2007 data is a conservative estimate because it is expected that the Hispanic population has grown as a share of the Irving population since 2007, a fact supported by a comparison with the 2008 ACS data.

The illustrative districts are composed of fewer than 65,000 people, and therefore Ely only had ACS estimates of the Hispanic share of the CVAP for all of the Irving ISD. To estimate the Hispanic CVAP in the illustrative districts, Ely compares the 2000 Census and 2007 ACS data estimates to calculate an annual growth rate of 3.05%. P. Ex. 1 at 10. In other words, using the difference between the 2000 and 2007 estimates, Ely estimates that the Hispanic population in the Irving ISD grew at an annual rate of 3.05%. Applying the same method to non-Hispanics, Ely estimates that the number of non-Hispanics in the Irving ISD declined at an annual rate of 2.28% over the same period. *Id.* Ely then applies these district-wide growth rate estimates to the 2000 Census population in the illustrative districts to calculate an estimate of the population's characteristics as of 2008.

In reaching his relevant findings and opinions, Ely makes some critical assumptions: that the growth rate for the entire district applies uniformly throughout the district, applies forward into 2008, and applies specifically in the illustrative districts. Benavidez has not presented evidence to support these assumptions, and defendants have adduced persuasive evidence to the contrary. Specifically, defendants' expert witness, Norfleet W. Rives, Ph.D. ("Dr. Rives"), has pointed to evidence that undermines Ely's growth-rate assumptions and his resulting estimates of the 2008 Hispanic population in the illustrative districts.

Most significant, Dr. Rives testified that, due to the larger margins of error for ACS estimates, Ely's estimated growth rates are not reliable enough to apply them to such small population groups. Ely relies on the 2007 ACS data estimates in predicting growth rates and 2008 population levels. The margins of error for the 2007 ACS data estimates of the Hispanic population in the Irving ISD are quite large because these population estimates reach the limit of the reliability of data drawn from a small sample. Dr. Rives testified that the ACS only sampled 1.2% of the housing units in Irving.

In Illustrative District A, the 2000 total population was only 23,335, well below the 65,000 level at which the Census Bureau

publishes ACS single-year estimates that it considers reliable.[12] *See* P. Ex. 1 at Table 2. Ely's estimate of the Hispanic CVAP in all of the Irving ISD is 19,071, using the 2007 ACS data. Dr. Rives has demonstrated that the margin of error on this estimate indicates only 90% confidence that the true Hispanic CVAP is between 16,239 and 21,903 (a range of 5,664 persons). *See* Ds. Ex. 29. This is a materially large confidence interval considering that Ely's projection of the total Hispanic CVAP in illustrative District A in 2008 is 4,282, with a total CVAP of 7,727. Ely's CVAP estimates lead him to conclude that Hispanics made up 55.42% of the CVAP in District A in 2008. This is the crucial estimate offered to prove that District A exceeds the greater-than-50% threshold required by *Gingles*. But if Ely's estimate of the number of eligible Hispanic voters in District A is off by *just 419 people*, assuming his total CVAP estimate is correct, the district would not be majority-minority and would therefore fail *Gingles*' first prong.

Although Benavidez must prove his § 2 claim by a preponderance of the evidence, in order to meet this burden using 2007 ACS data, he must overcome the strong presumption in favor of the 2000 Census based on proof that is thoroughly documented, has a high degree of

---

[12]The court focuses on District A only because it has the highest predicted Hispanic share of CVAP. The analysis applies with equal (if not greater) force to Districts B and C, which are predicted to have smaller Hispanic shares of CVAP.

accuracy, and is clear, cogent, and convincing.  Considering the large margins of error for the 2007 estimates of the Hispanic CVAP, the court finds that Benavidez has failed to prove that the 2007 ACS one-year data are sufficiently reliable to overcome the presumption that the 2000 Census is correct.  Ely relies on the uncertain 2007 estimates in calculating the growth rate to project the 2008 population size, making his estimated growth rate and the 2008 population estimates correspondingly unreliable.

"Courts have rejected overly simplistic, 'crude' analyses that are easy and inexpensive to calculate but too inaccurate to serve as a basis for changing the basis of conducting elections." *Perez v. Pasadena Indep. Sch. Dist.*, 958 F. Supp. 1196, 1213 (S.D. Tex. 1997), *aff'd*, 165 F.3d 368 (5th Cir. 1999).  In *Valdespino* the Fifth Circuit upheld the district court's departure from reliance on census data because the defendant's expert demographer (the same Dr. Rives who testified for defendants at this trial) had undertaken a thorough actual count of housing units in a newly developed area.  *See Valdespino*, 168 F.3d at 854.  During the trial of this case, Dr. Rives explained that in *Valdespino* some door-to-door work was performed to gather accurate post-census information. Dr. Rives testified that a sort of "mini-census" was conducted that was comparable to the actual count to which the census aspires. Here, the use of the ACS data does not similarly meet the high standards and thorough coverage of the decennial census.  And as to

the uncertainty of using 2007 numbers to project population forward into 2008, "'[e]stimates based on past trends are generally not sufficient to override "hard" decennial census data.'" *Perez*, 958 F. Supp. at 1210 (quoting *McNeil v. Springfield Park Dist.*, 851 F.2d 937, 946 (7th Cir. 1988)).

Because Ely's derivation of the growth rate and application of the 2007 ACS data to such a small population are not sufficiently reliable and accurate, Benavidez must rely on the 2000 Census data. He has therefore failed to prove by a preponderance of the evidence that the Hispanic CVAP of each illustrative district exceeds 50%. He has not proved changed figures that are thoroughly documented, have a high degree of accuracy, and are clear, cogent, and convincing.

C

The court's finding is confirmed by other evidence that Dr. Rives presented and that undermines Ely's assumptions.  To test the reliability of the growth rate estimates, Dr. Rives compared Ely's 2008 population estimates to the "demographic carrying capacity" measured by Dallas County Appraisal District's actual counts of the Irving housing stock.[13]  Dr. Rives testified that the housing stock reveals that Ely's growth estimates must be inflated because the

---

[13]"Actual counts" indicates that the Dallas County Appraisal District numbers are not estimates but are exact counts of the housing stock made for purposes of determining the county's property tax collection.

resulting population predictions are greater than what the actual housing stock in the illustrative districts can likely bear.[14]  Dr. Rives demonstrated that while the number of housing units in the Irving ISD rose between 2000 and 2007, the number of units in the illustrative districts declined.[15]   This evidence supports a reasonable inference that, although demographic shifts did occur in Irving, they were less likely to take place in the illustrative districts, which were areas of housing stock decline, than in other parts of the Irving ISD where growth in the housing stock occurred. This inference undermines Ely's assumption that the population in the illustrative districts grew at rates similar to the Irving ISD as a whole.

More generally, Dr. Rives notes that the Hispanic population in Ely's illustrative districts has a much higher share of non-citizens than does the district at large.  In the Irving ISD as a whole, non-citizens make up around 60% of the adult Hispanic population.  In contrast, in District A, for example, non-citizens comprised around 70% of the adult Hispanic population in 2000.  The

_____

[14]Dr. Rives notes Ely's growth predictions only cover the adults in the population, and therefore do not even include the structurally-related increase in children.  Dr. Rives used Ely's methodology to compute a total population estimate that includes growth in the child population.  The resulting population numbers are inflated when compared to the actual housing stock capacity, confirming the unreliability of Ely's growth projections.

[15]For example, while District A lost 163 housing units between 2000 and 2008, the remainder of the Irving ISD grew by almost 4,000 housing units.  *See* Ds. Ex. 23.

illustrative districts therefore contain a larger proportion of Hispanic non-citizens than does the remainder of the Irving ISD. Further, the non-citizen Hispanic population is growing at a faster rate than is the citizen Hispanic population.  According to Dr. Rives, this suggests that growth rates applicable to the district at large might not apply to the *citizen* Hispanic community in the illustrative districts.  The growth in the Hispanic community in the illustrative districts may be primarily the result of non-citizen migration.  This critique further undermines Ely's uniformity assumptions.

Ely counters that while the areas captured in his illustrative districts had much lower rates of citizenship than did other neighborhoods in the Irving ISD in 2000, the natural aging of the Hispanic youth population since 2000 would account for substantial growth in the Hispanic CVAP.  Because the citizenship rate of Hispanics under 18 is much higher than for residents age 18 and older,[16] Ely argues that the predicted growth in the Hispanic CVAP in the illustrative districts can be explained by the natural aging of these young citizens and need not be explained by a migration of new residents.  Children age 10 to 17 in 2000 were voting-age adults in 2008.  But for this fact to prove Ely's point, it is necessary that a large number of these citizen children continue to

---

[16]This is due to the fact that many children born of non-citizens were born in the United States and are therefore citizens.

live with their parents into adulthood or move within only one or two miles (to remain within the illustrative districts). The 2000 Census reported only 4,912 Hispanic children citizens between age 10 and age 17 in *all* of the City of Irving. Ds. Ex. 4 at Ex. 5. Further, the stability in the overall citizenship rates for Hispanics in Irving indicates that any aging up of citizen youths must be counterbalanced by the influx of non-citizen adult immigrants. The court finds Ely's explanation insufficient to reconcile the large estimate of growth in the Hispanic CVAP predicted by Ely and the actual decline in the housing stock, and by inference the decline in the population size, demonstrated by Dr. Rives.

D

In summary, the court finds that Benavidez has failed to present proved changed figures that meet the high standard that they be thoroughly documented, have a high degree of accuracy, and be clear, cogent, and convincing. Therefore, he cannot rely on 2007 ACS data in lieu of 2000 Census data. As noted, all parties agree that the 2000 Census data do not support the finding that the illustrative districts contain a majority Hispanic CVAP. Because Benavidez has failed to prove the first prong of the *Gingles* threshold test, the court need not consider the other elements of his § 2 claim. *See Valdespino*, 168 F.3d at 852 (holding that lack of evidence to prove any *Gingles* prong is fatal to § 2 claim).

- 19 -

V

The court recognizes that today's decision reaches a different result than did Judge Solis in *Benavidez v. City of Irving, Texas*, 638 F.Supp.2d 709 (N.D. Tex. 2009) (Solis, J.). In *City of Irving* Judge Solis found that the at-large method of electing members of the City of Irving, Texas City Council violates § 2. The boundaries of the Irving ISD and the city of Irving are not identical, but they are substantially similar. Expert witnesses who testified in the present case also testified in *City of Irving*. But the decision in *City of Irving* does not preclude the court from reaching a different result in this case.[17]

First,

> [t]here is no such thing as the "law of the
> district." Even where the facts of a prior
> district court case are, for all practical
> purposes, the same as those presented to a
> different district court in the same district,
> the prior resolution of those claims does not
> bar reconsideration by this Court of similar
> contentions. The doctrine of *stare decisis*
> does not compel one district court judge to
> follow the decision of another. Where a
> second judge believes that a different result
> may obtain, independent analysis is
> appropriate.

*Threadgill v. Armstrong World Indus., Inc.*, 928 F.2d 1366, 1371 (3d Cir. 1991) (internal quotation marks, citations, and footnotes omitted).

---

[17]The undersigned, of course, has the utmost respect for Judge Solis, who is an esteemed and able colleague.

Second, Judge Solis's decision predates *Reyes*, in which the Fifth Circuit affirmed Judge O'Connor's decision rejecting a § 2 challenge to the City of Farmers Branch, Texas at-large method of electing members of its city council.  Judge O'Connor found that, at best, it was only "*as likely as not* that the [Hispanic CVAP] constituted a majority in the demonstration district," *Reyes*, 586 F.3d at 1022 (emphasis in original), i.e., that the evidence did not preponderate in the plaintiffs' favor concerning the majority-minority requirement.

In *Reyes* the plaintiffs lacked data that reflected the actual number of Hispanic CVAP living in the demonstration district.  They attempted through three indirect ways to prove that the Hispanic CVAP constituted a majority: first, they relied on an estimate made by the Texas Legislative Council ("TLC") of the number of Spanish Surnamed Registered Voters ("SSRVs") in the demonstration district; second, they undertook an "actual count" of the Hispanic CVAP in the demonstration district; and, third, they tried to show a Hispanic CVAP majority by arguing that Hispanics register to vote at a lower rate than non-Hispanics, *id.*

Concerning the first method, Farmers Branch presented testimony from Dr. Rives.  He faulted the TLC estimate because it was inaccurate in small geographic areas like the demonstration district (something about which the TLC itself had warned), and the demonstration district split a voting precinct with an uneven

- 21 -

distribution of SSRVs, which the TLC had no way to allocate.  *Id.*
Judge O'Connor credited Dr. Rives's testimony, concluding that it
was just as likely that the plaintiffs' proposed district did not
have a majority Hispanic CVAP.  *Id.*

As to the second method—the "actual count" of the Hispanic
CVAP in the demonstration district—the plaintiffs took the roll of
registered voters in the demonstration district and, using the
Census Bureau's list of Spanish surnames, counted the number of
SSRVs on the roll.  When this calculation showed that SSRVs
accounted for only 46.5% of the registered voters, the plaintiffs'
expert claimed that the test did not record as Hispanic certain
voters who were Hispanic.  Using "a complex process—involving
door-to-door personal inspection at residences with suspected
Hispanic voters—[the expert] changed dozens of results from
non-Hispanic to Hispanic."  *Id.*  On this basis, the plaintiffs
increased the number of registered Hispanic voters to 50.7%.  *Id.*
Judge O'Connor rejected this calculation because the expert had
adjusted for Hispanic voters not captured by the Spanish surname
list but had failed to counter-adjust for non-Hispanic voters who
had been erroneously counted by the Spanish surname list.  *Id.*

Based on the third indirect method, the plaintiffs tried to
show a Hispanic CVAP majority by arguing that Hispanics register to
vote at a lower rate than non-Hispanics.  Extrapolating data from
the whole of Dallas County, they urged that for every 1.79 Farmers

Branch Hispanic citizens of voting age, only one actually
registered to vote. The corresponding non-Hispanic ratio was
1.279-to-one. They argued that, based on these ratios, and given
the list of SSRVs in the demonstration district, the Hispanic CVAP
would constitute a majority. *Id.* Judge O'Connor did not credit
this testimony because he "doubt[ed] its assumption that macro data
from Dallas county could properly, or at least with persuasive
force, be applied wholesale to the much smaller demonstration
district." *Id.* And a defense witness testified that the TLC
showed that Hispanic citizens in the demonstration district
actually registered at a much higher rate than one out of 1.79.
*Id.*

On appeal, the plaintiffs pressed one main factual argument:
that it was illogical for Judge O'Connor at one point to discount
the weight of the plaintiffs' TLC estimate and then at a different
point to rely on the TLC to discredit the plaintiffs' assumed ratio
of registered Hispanic voters to Hispanic citizens. *Id.* at 1024.
The Fifth Circuit held that Judge O'Connor had adequately explained
his reasoning. In the first instance, the plaintiffs attempted to
use the TLC estimate to prove on its own that the SSRVs in the
demonstration district comprised a majority. *Id.* Judge O'Connor
conceded that the TLC estimate was probative, but he did not think
that the estimate, with its attendant unreliability, was enough to
satisfy the plaintiffs' burden of proof. *Id.* at 1025. In the

- 23 -

second instance, Farmers Branch offered a different calculation from the TLC study to rebut the plaintiffs' assumption that Hispanic citizens in the demonstration district register to vote at the low rate of one out of 1.79. *Id.* The Fifth Circuit upheld Judge O'Connor's decision, holding that he "could properly conclude that the use made of the data determined its probative value[.]" *Id.* And the panel concluded that, even without this evidence, "the bare assumption that registration rates from Dallas County could be applied wholesale to small neighborhoods would not have been enough to discharge the burden of proof." *Id.* This was because the assumption rested on the logical fallacy that because the Hispanic citizenship rate in Farmers Branch was similar to the citizenship rate in Dallas County as a whole, the voter registration rate must also be similar. But Farmers Branch is but a small part of one of the largest metropolitan areas of the country. And "[w]e know that issues local to a part of the county could well push registration at a local rate." *Id.*

The problem with the TLC data addressed in *Reyes* mirrors the faults this court finds with the application of the 2007 ACS data to determine the Hispanic CVAP in Benavidez's illustrative districts. And just as the TLC warned about the use of its data in small geographic areas, the ACS Guide cautions about the limitations on the reliability of using its one-year data in the context of populations of fewer than 65,000. Judge Solis relied on

the fact that the ACS data were replacing the long form of the
decennial census to support his finding that the ACS data were as
reliable as Census data for Voting Rights Act decisions.  *See
Benavidez*, 638 F.Supp.2d at 729 ("ACS data *is* Census data.").  But
the ACS itself makes clear that the ACS data are only a suitable
substitute for limited purposes in which the larger margin of error
and the smaller sample size of the data are taken into account.[18]
And the ACS Guide also makes clear that the substitute for small
populations is actually the three-year and five-year pooled data,
not one-year data.  *See* P. Ex. 16 at 48.

Further, in *Reyes* the Fifth Circuit specifically upheld Judge
O'Connor finding that Dallas County Hispanic voter registration
numbers could not reliably be applied to Farmers Branch, a small
portion of Dallas County.  Similarly, this court finds that the
growth rates for all of the Irving ISD cannot reliably be applied
to the illustrative districts, which have demonstrably different
characteristics than the school district as a whole, including a
large number of non-citizen Hispanics.

In sum, *Reyes*, decided after *City of Irving*, confirms this
court's finding that Benavidez's proof is fatally deficient in this

---

[18]The court only finds ACS data unreliable as they were used
in this case.  ACS data may be sufficiently appropriate and
accurate for myriad purposes, including analysis of large
populations and even hypothesis testing of small populations,
because hypothesis testing takes into account the larger margins of
error.

case.  This court has the benefit of the Fifth Circuit's decision in *Reyes*.  Judge Solis did not.[19]

                    *     *     *

     Accordingly, for the reasons explained, the court finds that Benavidez has failed to prove the first essential element of his § 2 claim.  After the results of the 2010 Census are published, Benavidez may be able to obtain the relief he seeks—trustees elected from single member districts—without the need for another lawsuit.  The 2010 Census may confirm Benavidez's contention that a majority Hispanic CVAP district can be drawn.  But for now, Benavidez has failed to overcome the strong presumption that the 2000 Census data are correct.  These data, when applied to the first *Gingles* factor, defeat his § 2 claim.

     January 20, 2010.


                              _____
                              SIDNEY A. FITZWATER
                              CHIEF JUDGE

---

[19]Moreover, the parties in *City of Irving* have reached a settlement, meaning that Judge Solis's ruling will not be reviewed by the Fifth Circuit.  The court therefore cannot say that *City of Irving* would stand undisturbed if reviewed under *Reyes* and other decisions of the Supreme Court and the Fifth Circuit.